1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   JOHN P. MORGAN,              No.  CIV. S-12-1287 LKK/DAD

12              Plaintiff,

13        v.                      **ORDER**

14   JANET NAPOLITANO, SECRETARY,
     U.S. DEPARTMENT OF HOMELAND
15   SECURITY,

16              Defendant.

17

18        Plaintiff John P. Morgan brings this employment

19   discrimination lawsuit against defendant Janet Napolitano,

20   Secretary of the United States Department of Homeland Security

21   ("DHS"),[1] with claims arising under Title VII of the Civil Rights

22   Act of 1964, as amended ("Title VII"), the Americans with

23   Disabilities Act ("ADA"), and the Age Discrimination in

24   Employment Act of 1967 ("ADEA"), as well as for review of an

25   ────────────────
     [1] The court takes judicial notice that Ms. Napolitano is no longer
26   DHS Secretary, and that the position is currently vacant. These
     facts are not material to the instant case. Ms. Napolitano is a
27   nominal defendant; neither party's briefing refers to any action
     taken by Ms. Napolitano in either her official or her personal
28   capacity.

                              1

1  administrative decision.

2      Defendant's summary judgment motion came on for hearing on

3  December 9, 2013. For the reasons set forth below, defendant's

4  motion will be granted in part and denied in part.

5      **I.    BACKGROUND**

6          **A. Factual Background**

7      Defendant filed a Statement of Undisputed Facts in support

8  of her motion. (ECF No. 41.) In opposition, plaintiff filed both

9  a Response to this Statement (ECF No. 45) and a Statement of

10 Disputed Facts (ECF No. 46). At the outset, it is worth noting

11 two peculiarities about how the parties responded to the facts

12 therein.

13     The first lies in the form of plaintiff's responses to a

14 number of defendant's undisputed facts. Many of these responses

15 carry the peculiar phrasing, "Admitted that [name of affiant or

16 deponent] testified as stated." This form of response does not

17 controvert the truth of the fact so addressed. Accordingly, so

18 long as the testimony in question is admissible,[2] the facts

19 introduced are treated as undisputed. See Fed. R. Civ. P. 56(c).

20     The second peculiarity is that, in her reply, defendant

21 largely fails to raise evidentiary objections or otherwise

22 contest plaintiff's Statement of Disputed Facts. Accordingly, the

23 court must treat any disputed fact for which plaintiff has

24 adduced admissible evidence as undisputed, at least for purposes

25 of this motion. That said, a number of plaintiff's disputed facts

26 _____

27 [2] "A trial court can only consider admissible evidence in ruling
   on a motion for summary judgment." Orr v. Bank of America, NT &
   SA, 285 F.3d 764, 773 (9th Cir. 2002).

28

1    lack any citation to supporting evidence, and will be disregarded

2    on these grounds.

3         In light of the foregoing, the following facts appear both

4    adequately supported by evidence, and either undisputed or

5    sufficiently uncontroverted.

6         Plaintiff commenced civilian employment with the federal

7    government in 1982, continuing until his discharge on January 7,

8    2009. (Plaintiff's Response to Defendant's Statement of

9    Undisputed Facts ("PR-DSUF") ¶ 2, ECF No. 45.) At all times

10   relevant to this action, plaintiff, who was born on June 24,

11   1947, was over the age of forty. (Plaintiff's Statement of

12   Disputed Facts ("PSDF") ¶ 9.A, ECF No. 46.)

13        Plaintiff was formerly a Criminal Investigator with the DHS,

14   U.S. Immigration and Customs Enforcement's ("ICE") Federal

15   Protective Service ("FPS") in Sacramento, California.[3] (PR-DSUF

16   ¶ 1.) Plaintiff was assigned to Region 9, which includes

17   Sacramento and San Francisco. As a Criminal Investigator,

18   plaintiff was responsible for conducting investigations of

19   criminal activity on federal property. (Id. ¶ 4.)

20        Plaintiff's wife, Rayna Becker, is an attorney. She

21   represented various employees of her husband's agency in

22   employment-related proceedings between 1998 through 2006. (PR-

23   DSUF ¶¶ 8, 30, 31.)

24        Among the agency employees that Becker represented was one

25   Michael Conrad, formerly a Special Agent in Charge of Criminal

26   _____

27   [3] The parties' motion papers frequently use the term "agency,"
     without specifying whether the relevant agency is FPS, ICE, or
     DHS. Where the context makes the distinction clear, the relevant
28   agency is identified; otherwise, the term "agency" is used.

1   Investigations, Region 9. (Decl. Conrad ¶ 2, ECF No. 42-3.)

2   Conrad originally hired plaintiff in 1992, and supervised him

3   thereafter. (Id. ¶¶ 3, 4.) Becker represented Conrad from June

4   1998 through May 2003 in an EEO retaliation matter, and again,

5   from November 2004 through June 2006 in both a retaliation matter

6   and a disability case. (Id. ¶¶ 40, 41.)

7       Conrad describes an interaction he had with one Joe Loerzel,

8   formerly Regional Director for Region 9, as follows:

9           [I]n the Spring of 2002, Loerzel took me
            aside while in Los Angeles on work-related
10          business and secretly offered to pay $20,000
            to me if I dropped my lawsuit against the
11          Agency. He did not tell my attorney about
            offering the deal. Loerzel also told me to
12          fire my attorney and accept his deal. He knew
            I was represented by attorney Becker. Loerzel
13          then told me, "It looks bad when you use
            another employee who works for you, who has
14          done nothing wrong, and hire his wife as your
            attorney. It gives you both black eyes and
15          doesn't look good for the Agency. You'll
            never win this!" (Decl. Conrad ¶ 28.)
16

17

18  According to Conrad, Loerzel ceased working for the Federal

19  Protective Service in July 2005. (Id. ¶ 27.)

20      Between December 2003 and November 2005, plaintiff was

21  detailed to various temporary, "acting" positions in San

22  Francisco. (PR-DSUF ¶ 113.) The first of these positions was

23  Acting Supervisory Criminal Investigator, which plaintiff held

24  until May 25, 2005. (PSDF ¶ 1.B.)

25      On March 1, 2005, plaintiff began a term as Acting Chief,

26  Threat Management Bureau, continuing in this position until

27  November 7, 2005. (Id.)

28

1    At the end of September 2005, plaintiff had a one-week

2 temporary stint as Regional Director and Deputy Regional

3 Director. (Id.) Plaintiff has submitted declarations of three

4 supervisors attesting to his exemplary performance in these

5 acting positions. (Decl. Conrad; Decl. Meyerhoff, ECF No. 42-2;

6 Decl. Oase, ECF No. 42-4.)

7    On Friday, October 28, 2005, Loerzel, the former Regional

8 Director, sent an email to Kenneth Ehinger (agency Deputy

9 Director, Mission Support), which reads in pertinent part:

10
11      I'm going to offer you a suggestion regarding
        the [Region 9] Threat Chief position . . . .
12      You should get a referral next week with only
        one qualified name on it – JP Morgan [*i.e.*,
        plaintiff] . . . . I'm going to trust that
13      you will not share this message with anyone
        but Paul and certainly not with the R9 folks.
14
15      My recommendation is that you do not approve
        that selection. I say this for two reasons:
16
17      1) [T]he region is one of the most difficult
        to manage and the responsibilities will be
        over JP's head – he is currently a GS-12 CI
18      and would be better suited for the senior CI
        13 position which is also currently open. He
19      qualified because he was detailed to the 14
        when Don went east. I don't think his
20      selection would be in the best interest of
        FPS primarily due to his lack of experience
21      and the high demands of the region,
        especially the courts . . . .
22
23      2) JP's wife is an attorney who handles many
        of FPS' regional labor cases. She represented
24      Mike Conrad and is now representing
        Brewster . . . . I don't know what happen
25      [*sic*] with it after I left but I denied it.
        Anyway, without getting into the weeds and
26      suggesting improprieties, she seems to get
        background information on these cases that
27      attorneys' [*sic*] usually don't have. I think
        there's a potential conflict of interest
28

there. You may recall the lawsuit going on by Conrad and Dave Current when I arrived – which we lost on Conrad and prevailed on Current – she was their attorney.

Anyway, its [*sic*] now on your shoulder to handle. Again, please keep this correspondence confidential. (Opposition Exh. I, ECF No. 42-16.)

That same day, Ehinger forwarded this email to Paul Durette, FPS Deputy Director for Operations (and later FPS Acting Director), adding, "Need to discuss both issues next week. I am going to suggest that [*sic*] to OPLA that they seek a recusal by the subject attorney. The TMP chief issue is yours but his logic seems remarkably logical and based in sound judgement [*sic*] . . . ." (Id.)[4]

Approximately one week later, a series of events, which are the basis of this lawsuit, began.

On November 4, 2005, plaintiff's annual leave was canceled by Ruben Ballestros, Acting Supervisory Criminal Investigator, only to be restored by Plaintiff's then-supervisor, Russell Oase. (PSDF ¶ 5.A.)

On November 7, 2005, Rudy Negrete replaced plaintiff as Acting Chief, Threat Management Branch. (PR-DSUF ¶¶ 61, 65; PSDF ¶ 1.B.) Plaintiff was never again named to a higher-level "Acting" position. (Amended Decl. Morgan ¶ 42, ECF No. 47-1.)

Beginning on November 8, 2005, and for over two years thereafter, plaintiff was not provided an FPS criminal

---

[4] Defendant objects that this email is inadmissible.

6

1   investigator/special agent to work with, contrary to agency

2   practice. (Amended Decl. Morgan ¶ 21.)

3        In early December 2005, Negrete demanded plaintiff's

4   immediate presence in San Francisco for a program review. He was

5   stationed in Sacramento at the time. Other, similarly-situated

6   employees were given sufficient notice of the review to adjust

7   their schedules, while plaintiff was not. Plaintiff attended the

8   program review, participating for 20 minutes. (PSDF ¶ 5.C;

9   Amended Decl. Morgan ¶¶ 23-24.)

10       At some point in December 2005 or January 2006, Negrete

11  learned of Becker's representation of an employee against the

12  agency. (PR-DSUF ¶ 66.)

13       On January 6, 2006, Oase was removed from his position as

14  Deputy Regional Director. (PSDF ¶ 4.D.)

15       On January 12, 2006, Negrete issued plaintiff notice of a

16  proposed five-day suspension in connection with his failure to

17  comply with an "Order, Direction, Instruction, or Assignment of a

18  Supervisor" in connection with the December 2005 program review.

19  (Amended Decl. Morgan ¶ 26.)

20       On January 12, 2006, plaintiff was issued a vehicle that

21  complied with specifications for FPS criminal investigators; the

22  next day, Ballestros and Negrete ordered that plaintiff exchange

23  it for a vehicle that did not meet these specifications (*e.g.*, it

24  was easily-identifiable as a law enforcement vehicle, it lacked

25  emergency equipment and an agency radio, etc.). (Amended Decl.

26  Morgan ¶ 28.)

27       On January 23, 2006, Ballestros denied plaintiff's request

28  to use annual leave to attend his aunt's funeral. (PSDF ¶ 5.G.)

In February 2006, Negrete departed the position of Acting Chief, Threat Management Branch. (PR-DSUF ¶ 62.)

On February 12, 2006, plaintiff interviewed for the position of Chief, Threat Management Branch. (PR-DSUF ¶ 90.) Plaintiff ended the interview by reciting a Rudyard Kipling poem, becoming teary-eyed as he read it. (PR-DSUF ¶ 94.) Nine days later, plaintiff was informed that he was not selected for the position, which he had held on an acting basis from December 15, 2003 to May 25, 2005. (Amended Decl. Morgan ¶¶ 32, 36.) The interview panel scored each candidate with scores ranging from a high of 130 to a low of 32; plaintiff's score was 64. After the two top-scoring candidates turned down the position, it went unfilled. (PR-DSUF ¶¶ 90-92.)

That same day, plaintiff also learned that he had not been selected for another position to which he had applied, that of Supervisory Criminal Investigator. The position went to one John Hartman, who was 20 years younger than plaintiff. (Decl. Oase ¶ 29.)

By agency decision dated March 3, 2006, plaintiff was suspended for five days with loss of pay and benefits. (Amended Decl. Morgan ¶ 39.) This was the first time that plaintiff had been subject to discipline during his career with the federal government. (Id.) Shortly thereafter, plaintiff was notified by the agency that he did not qualify for union representation in contesting the suspension. (Id.; Decl. Wright ¶ 2, ECF No. 42-18.) Plaintiff was a member of the American Federation of Government Employees. When a fellow union member contacted the agency's Employee Labor Relations office, the person he spoke to,

1   one Tony Ashby, said that plaintiff's wife Rayna Becker had

2   represented several FPS employees against the agency, and he

3   "could not stand" her. (Decl. Wright ¶ 3.)

4        On March 31, 2006, plaintiff made his first informal EEO

5   complaint. On July 26, 2006, he followed up with a formal EEO

6   complaint, case number HS-06-ICE-002648. (PR-DSUF ¶¶ 9, 10; Mot.

7   Exh. F, ECF No. 41-2.)

8        In June 2006, at an "all hands" meeting, Acting Regional

9   Direct Steve Dade made disparaging remarks regarding EEO

10  complaints. Plaintiff reported these comments to the agency's EEO

11  Manager, Deborah Lewis. (Amended Decl. Morgan ¶ 47.)

12       By letter dated August 10, 2006, ICE's EEO office dismissed

13  all of Morgan's claims except for (i) being passed over for the

14  positions of Chief, Threat Management Branch and Deputy Regional

15  Director, (ii) the five-day suspension, and (iii) not being

16  selected for "acting" supervisory positions beginning in February

17  2006. (PR-DSUF ¶ 14.)

18       In October 2006, ICE received an anonymous tip that

19  plaintiff, as a favor to a friend, had run background checks on

20  applicants to his friend's private security firm. (PR-DSUF ¶ 119;

21  Opposition Exh. 10, ECF No. 42-10.) In response, the agency's

22  Office of Professional Responsibility ("OPR") interviewed

23  plaintiff. Before the interview began, plaintiff was advised in

24  writing that he could not disclose any information about the

25  investigation, and that a failure to comply could lead to

26  discipline and/or criminal prosecution. Plaintiff signed a

27  statement acknowledging receipt of these warnings. (Id. ¶ 121.)

28

During the interview, plaintiff denied running background checks for his friend. (PR-DSUF ¶ 122.) Plaintiff and defendant disagree as to what else occurred at the interview, but it is reasonable to infer that plaintiff (i) acknowledged conducting background checks on one or more individuals in connection with his employment, and (ii) mentioned the involvement of one ICE Special Agent Luz Dunn in conducting these checks. (Id.)

Four days after the interview, plaintiff arranged to meet Dunn for lunch "in the spirit of Christmas." When she arrived at his office, he gave her a carrot cake and pointed out a magazine on his desk. Dunn said she was familiar with the magazine, but plaintiff insisted that she open and read it. (PR-DSUF ¶ 123.) Dunn avers that inside was an affidavit that included her name and the name "Mustafa," a "suspicious [A]rab male[] seen in the parking lot of the federal building in Sacramento" whom Dunn had included in queries to various databases. (Affid. Dunn, Mot. Exh. Z, ECF No. 41-3.) Dunn averred that she felt intimidated by Morgan's conduct, and reported his actions to OPR. (PR-DSUF ¶ 126.)

Later in 2006, Special Agent Timothy Rivero was sent by Acting Regional Director Dade to Sacramento to seize tape recordings from plaintiff's office. (PR-DSUF ¶ 116.) Rivero searched the office and took the tape recordings on December 1, 2006. (Id. ¶ 15.) Rivero and Dade testified that, according to their understanding, plaintiff had been tape recording staff meetings and other agents surreptitiously, against agency policy. (Id. ¶ 117.) Plaintiff's account is different:

> I found this practice [*i.e.*, tape recording]
> also useful in non-investigative meetings. I
> openly, in plain sight and with the notice of
> my supervisors, tape recorded some meetings
> that I attended, including some "all hands"
> staff meetings. I did so without objection or
> counseling from my supervisors throughout my
> employment with the federal government and
> continuing until this practice was possibly
> questioned in December 1, 2006 when my tape
> recordings were illegally seized . . . .
> After my tapes were seized, I stopped the
> practice of recording meetings. (Amended
> Decl. Morgan ¶ 46.)

Plaintiff believes that Dade sought to seize recordings of the June 2006 meeting where he (Dade) had impugned EEO complaints; however, plaintiff had not recorded this meeting. (Amended Decl. Morgan ¶¶ 47, 49.)

Plaintiff had previously requested training; on December 8, 2006, this request was denied. (Amended Decl. Morgan ¶ 50.)

Plaintiff then amended his EEO complaint to add claims relating to the search of his office, the denial of his training request, and the refusal to place him in any "acting" supervisory positions. (PR-DSUF ¶ 15; Mot. Exh. I, ECF No. 49.) By letter dated February 15, 2007, ICE's EEO office accepted these issues for investigation. (Mot. Exh. J, ECF No. 41-2.)

On March 12, 2007, plaintiff had a Policy Compliance Interview with two Special Agents regarding plaintiff's tape recording of conversations. He was denied union representation at this interview. (Amended Decl. Morgan ¶ 52.)

Between April and August 2007, plaintiff, while serving as a union steward, participated in the EEO complaints of two employees, Nathan Bailey (who complained of race and age

11

1  discrimination, and retaliation) and Douglas Neibauer (who

2  complaint of retaliation). (PR-DSUF ¶¶ 33, 34; Amended Decl.

3  Morgan ¶ 8.)

4      Around August 10, 2007, plaintiff received a Notice of

5  Proposed Removal from federal service for (i) tape recording

6  conversations without the consent of the parties, and (ii) lack

7  of candor. (Amended Decl. Morgan ¶ 59.) On October 22, 2007,

8  plaintiff was informed that the first charge was upheld, and

9  consequently, he would be suspended for 14 days without pay. (Id.

10 ¶ 65.)

11     Plaintiff again applied for the positions of Deputy Regional

12 Director and Chief, Threat Management Bureau. He was interviewed

13 in early December 2007, but did not receive either position.

14 (Amended Decl. Morgan ¶¶ 71, 72.) Mario Canton was selected for

15 the position of Chief, Threat Management Bureau. (PR-DSUF ¶ 86.)

16 Plaintiff and others had previously reported to various agencies

17 and offices within the Department of Justice and DHS that Canton

18 made false statements in his application. (Amended Decl. Morgan

19 ¶ 57.)

20     On December 17, 2007, plaintiff was interviewed by OPR

21 regarding many of the same events which led to his suspension

22 earlier that year. (Amended Decl. Morgan ¶ 75.)

23     Plaintiff was on sick leave between December 27, 2007 and

24 December 7, 2008. (PR-DSUF ¶ 6.) He had recently sought medical

25 care, and had been prescribed medication for anxiety and high

26 blood pressure. (Amended Decl. Morgan ¶ 75.)

27     On February 22, 2008, plaintiff made his second informal EEO

28 complaint. On June 2, 2008, he followed up with a formal EEO

complaint, case number HS-08-ICE-004459. (PR-DSUF ¶¶ 21, 22; Mot. Exhs. K, L.) The only adverse actions raised in this EEO complaint were non-selection for the positions of Chief, Threat Management Branch and Deputy Regional Director. (PR-DSUF ¶ 22.)

On June 13, 2008, plaintiff was barred from entering the federal building and the FPS offices at 650 Capitol Mall in Sacramento while on medical leave, absent advance request and approval. (Amended Decl. Morgan ¶ 92.)

On July 25, 2008, plaintiff made his third and final informal EEO complaint. On November 11, 2008, he followed up with a formal EEO complaint, case number HS-08-ICE-007526. (PR-DSUF ¶¶ 23, 24; Mot. Exhs. M, N.) The adverse actions raised in this EEO complaint were (i) being barred from the federal building and FPS offices, (ii) being charged as AWOL for four hours for failing to attend an OPR investigation in June 2008, and (iii) non-selection for the post of Deputy Regional Director.

On November 3, 2008, plaintiff was issued a Notice of Proposed Removal. (PR-DSUF ¶ 128.) Timothy Bane, FPS Regional Director for Region 1 (Boston), was the deciding official; he sustained plaintiff's discharge for the following reasons: disclosing information regarding the OPR investigation to Luz Dunn; attempting to influence Dunn; and failing to appear at an OPR interview on June 18, 2008. (PR-DSUF ¶¶ 131, 132, 135.)

Plaintiff was discharged on January 7, 2009. (PR-DSUF ¶ 2.)

Plaintiff grieved his termination. An arbitrator ultimately issued a decision upholding the termination. (Jul. 31, 2009 Arbitration Decision, Mot. Exh. CC, ECF No. 41-4.) Plaintiff then appealed to the Merit Systems Protection Board ("MSPB"). That

body upheld plaintiff's termination, though it overturned the charges regarding plaintiff's failure to appear at an OPR interview. (Apr. 13, 2012 MSPB Order ("MSPB Decision"), Mot. Exh. DD, ECF No. 41-4.)

A separate labor arbitration resulted in ICE being ordered to rescind plaintiff's 14-day suspension for tape recording meetings and return his materials. The arbitrator's decision concluded that "the initiation of the actual investigation via Mr. Dade's order to search [plaintiff's] office and seize his audiotapes was improper and unreasonable at its inception." (Mar. 23, 2009 Arbitration Decision, Opposition Exh. 9, ECF No. 42-9.)

### B. Procedural Background

Plaintiff initiated this action on September 21, 2009. (No. 09-cv-2649-LKK-DAD (hereinafter, "Morgan I.")) Plaintiff repeatedly amended his complaint over the next year-and-a-half in the face of successive motions to dismiss, ultimately filing a Fifth Amended Complaint. (Morgan I ECF Nos. 1, 7, 13, 24, 35, 57.)

On May 12, 2012, a little less than one month after the MSPB Decision, plaintiff initiated a new case (No. 12-cv-1287-LKK-DAD (hereinafter, "Morgan II")) by filing a complaint substantially identical to the operative complaint in Morgan I. The principal differences between the complaints were (i) the pleading of four additional facts, (ii) the replacement of plaintiff's age discrimination claim with a claim seeking judicial review of the MSPB Decision, and (iii) a prayer for reinstatement to plaintiff's previous position with DHS. (ECF No. 1.)

14

On October 3, 2012, in response to defendant's motion to consolidate and the parties' respective motions to amend the pretrial scheduling order, the court issued an order consolidating the two actions and directing plaintiff to file a single, comprehensive complaint. (Order, ECF No. 18.)

## II.   STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (it is the movant's burden "to demonstrate that there is 'no genuine issue as to any material fact' and that the movant is 'entitled to judgment as a matter of law'"); Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (per curiam) (same).

Consequently, "[s]ummary judgment must be denied" if the court "determines that a 'genuine dispute as to [a] material fact' precludes immediate entry of judgment as a matter of law." Ortiz v. Jordan, 562 U.S. ___, 131 S. Ct. 884, 891 (2011) (quoting Fed. R. Civ. P. 56(a)); Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (en banc) (same), cert. denied, 132 S. Ct. 1566 (2012).

Under summary judgment practice, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and "citing to particular parts of the materials in the record," Fed. R. Civ. P. 56(c)(1)(A), that show "that a fact cannot be . . . disputed."  Fed. R. Civ. P.

15

1  56(c)(1); <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp.</u>

2  <u>(In re Oracle Corp. Securities Litigation)</u>, 627 F.3d 376, 387

3  (9th Cir. 2010) ("The moving party initially bears the burden of

4  proving the absence of a genuine issue of material fact") (citing

5  <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986)).

6      A wrinkle arises when the non-moving party will bear the

7  burden of proof at trial. In that case, "the moving party need

8  only prove that there is an absence of evidence to support the

9  non-moving party's case." <u>Oracle Corp.</u>, 627 F.3d at 387.

10     If the moving party meets its initial responsibility, the

11  burden then shifts to the non-moving party to establish the

12  existence of a genuine issue of material fact. <u>Matsushita Elec.</u>

13  <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86 (1986);

14  <u>Oracle Corp.</u>, 627 F.3d at 387 (where the moving party meets its

15  burden, "the burden then shifts to the non-moving party to

16  designate specific facts demonstrating the existence of genuine

17  issues for trial"). In doing so, the non-moving party may not

18  rely upon the denials of its pleadings, but must tender evidence

19  of specific facts in the form of affidavits and/or other

20  admissible materials in support of its contention that the

21  dispute exists. Fed. R. Civ. P. 56(c)(1)(A).

22     The court's function on a summary judgment motion is not to

23  make credibility determinations or weigh conflicting evidence

24  with respect to a disputed material fact. <u>See</u> <u>T.W. Elec. Serv. v.</u>

25  <u>Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

26     "In evaluating the evidence to determine whether there is a

27  genuine issue of fact," the court draws "all reasonable

28  inferences supported by the evidence in favor of the non-moving

party." <u>Walls</u>, 653 F.3d at 966. Because the court only considers

inferences "supported by the evidence," it is the non-moving

party's obligation to produce a factual predicate as a basis for

such inferences. <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 810 F.2d

898, 902 (9th Cir. 1987). The opposing party "must do more than

simply show that there is some metaphysical doubt as to the

material facts . . . . Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving

party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475

U.S. at 586-87 (citations omitted).

**III. ANALYSIS**

    **A. Exhaustion of administrative remedies**

    Before bringing Title VII, ADA, or ADEA claims against the

federal government, plaintiffs must first exhaust administrative

remedies. Under regulations promulgated by the EEOC, federal

employees are required to contact an EEO counselor within 45 days

of the occurrence of a discriminatory act or personnel action "in

order to try to informally resolve the matter." 29 C.F.R.

§ 1614.105. The Ninth Circuit has "consistently held that, absent

waiver, estoppel, or equitable tolling, 'failure to comply with

this regulation [is] . . . fatal to a federal employee's

discrimination claim' in federal court." <u>Kraus v. Presidio Trust</u>

<u>Facilities Div./Residential Mgmt. Branch</u>, 572 F.3d 1039, 1043

(9th Cir. 2009) (quoting <u>Lyons v. England</u>, 307 F.3d 1092, 1105

(9th Cir. 2002)). An employee who is unable to informally resolve

the issue may file a formal complaint with the agency. 29 C.F.R.

§ 1614.106. The jurisdictional scope of any follow-on district

court action depends on the scope of the formal EEOC complaint, as well as "the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination." EEOC v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994) (quotation omitted) (emphasis in original).

"Whether a plaintiff . . . has timely exhausted her administrative remedies 'is an affirmative defense, [so] the defendant bears the burden of pleading and proving it.'" Kraus, 572 F.3d at 1046 n.7 (quoting Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997)).

### 1. Has plaintiff adequately exhausted administrative remedies?

Defendant contends that plaintiff failed to timely exhaust administrative remedies as to many of the adverse actions that he experienced, and therefore, that these claims are not actionable. According to defendant, plaintiff exhausted administrative remedies with respect to only eleven of the incidents of discrimination and/or retaliation that he alleges he faced:

> In this case Plaintiff contacted the EEO counselor with regard to three separate claims of discrimination: one on March 31, 2006, one on February 22, 2008 and one on August 21, 2008. For each of the alleged bases of discrimination contained in those complaints, Morgan has only exhausted those claims for the time period beginning 45 days before this contact with the EEO counselor. This means that only the following claims are properly before the court: (1) non-selection for the positions of Chief, [Threat Management Bureau] and [Deputy Regional Director] in February 2006, in January 2008, and again in November 2008; (2) Morgan's 5-

18

day suspension; (3) not being placed in any "acting" supervisory positions during the operational time periods since March 2006; (4) the December 2006 search of Morgan's office; and (5) the failure to process Morgan's training request in December 2006. (Motion 16 - 17.)

Plaintiff responds that defendant "seeks to limit [plaintiff] to five[5] actions, while ignoring the repeated and continuous retaliatory actions taken against [him] beginning in 2005." (Opposition 17.) He adds:

The actions claimed by [plaintiff] to be discriminatory in his complaint were either specifically raised as a claim, or were presented as like or similar actions not required to be separately charged. All actions complained of were investigated or should have been investigated. The Defendant . . . has had fair notice of all of [plaintiff's] claims alleged in his complaint. The Defendant . . . has not met her burden in establishing an affirmative defense . . . . (Id.)

There appears to be no question that plaintiff failed to exhaust administrative remedies regarding incidents that occurred before February 14, 2006, *i.e.*, the date 45 days before he filed his informal EEO complaint. ICE's EEO office recognized as much, notifying plaintiff in writing that the first ten incidents raised in his first complaint were time-barred. (Aug. 10, 2006 Letter, Mot. Exh. H, ECF No. 41-2.) Moreover, plaintiff has not raised any equitable defense, such as waiver or estoppel, to justify the untimely filing.

---

[5] Plaintiff miscounts the number of incidents that defendant acknowledges were properly exhausted. As defendant points out in her reply, there are eleven.

Nonetheless, as discussed below, plaintiff has raised a colorable claim that he was subject to a hostile work environment.[6] <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), is the Supreme Court's most significant recent pronouncement on the intersection between hostile work environment claims and the statute of limitations for filing EEO claims. The Court therein held:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [mandatory] time period after the discrete discriminatory act occurred. [. . .] [But] the statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim.

<u>Id.</u> at 113. Nevertheless, the Court recognized the existence of hostile environment claims which "are different in kind from discrete acts. Their very nature involves repeated conduct." <u>Id.</u> at 115. Such a claim:

> is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a . . . plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that

_____

[6] In his opposition to this motion, plaintiff alluded to the possibility that he was subject to a hostile work environment. <u>See</u> Opposition at 20:8-9 ("The retaliation and hostile environment is demonstrated by the continuous nature of adverse actions."). By Order dated October 31, 2013, the court requested further briefing from the parties as to this doctrine.

> some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Id. at 117.

To demonstrate that an actionable hostile work environment claim exists, "the plaintiff must show that her work environment was both subjectively and objectively hostile; that is, she must show that she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so." Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1034 (9th Cir. 2005). To assess objective hostility, the court must look to "all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)).

Finally, a hostile work environment can form the basis for a retaliation claim only if the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Ray v. Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

////

////

////

21

## 2. Are hostile work environment claims cognizable under the ADA?

Morgan, *supra*, addresses hostile work environment claims under Title VII. The Ninth Circuit has previously recognized the existence of ADEA hostile work environment claims. See Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1109 (9th Cir. 1991), abrogated on other grounds by statute as stated in Dominguez-Curry, 424 F.3d at 1041.

But neither the Supreme Court nor the Ninth Circuit has yet decided if plaintiffs may raise hostile work environment claims under the ADA. See Brown v. City of Tucson, 336 F.3d 1181, 1190 (9th Cir. 2003). There is a split among the other circuit courts of appeal as to whether such claims are cognizable. Five have explicitly held that the ADA recognizes hostile work environment claims. See Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006); Fox v. Gen. Motors Corp., 247 F.3d 169, 178 (4th Cir. 2001); Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229, 233 (5th Cir. 2001); Shaver v. Indep. Stave Co., 350 F.3d 716, 719-20 (8th Cir. 2003); Lanman v. Johnson Cnty., Kan., 393 F.3d 1151, 1155 (10th Cir. 2004). Two others have done so in summary orders, without further discussion. See, e.g., Hamera v. Cnty. of Berks, 248 Fed. Appx. 422, 425 (3rd Cir. 2007); Coulson v. The Goodyear Tire & Rubber Co., 31 Fed. Appx. 851, 858 (6th Cir. 2002). Three other circuits have assumed the existence of such a claim for the sake of argument, but have then found that the facts did not warrant allowing plaintiffs to proceed under the theory. See Vollmert v. Wisconsin Dept. of Transp., 197 F.3d 293, 297 (7th Cir. 1999); Gilliard v. Georgia Dept. of Corr., 500 Fed.

1  Appx. 860, 870 (11th Cir. 2012); Kuraner v. Mineta, No. 00-5416,

2  2001 WL 936369, 2001 U.S. App. LEXIS 18671 (D.C. Cir. 2001).

3  Finally, the Second Circuit, like the Ninth, has explicitly

4  declined to address whether the ADA provides a basis for hostile

5  work environment claims. See Margherita v. FedEx Exp., 511 Fed.

6  Appx. 71, 73 (2nd Cir. 2013).

7       District courts in the Ninth Circuit have generally divided

8  along similar lines, either by allowing such claims, see, e.g.,

9  Rood v. Umatilla County, 526 F. Supp. 2d 1164 (D. Or. 2007)

10  (Brown, J.), or allowing them only for the sake of argument, see,

11  e.g., Roberts v. Dimension Aviation, 319 F. Supp. 2d 985 (D.

12  Ariz. 2004) (Teilborg, J.); Wynes v. Kaiser Permanente Hosps.,

13  936 F. Supp. 2d 1171 (E.D. Cal. 2013) (England, J.).

14       The most thoroughly-reasoned of the preceding opinions is

15  Lanman, 393 F. 3d at 1155. There, the Tenth Circuit determined

16  that the ADA imports statutory language from Title VII which the

17  Supreme Court had previously held to give rise to hostile work

18  environment claims. The court reasoned, therefore, that Congress

19  intended the two provisions to have the same meaning and effect.

20  Id. The Lanman panel also noted that the "parallel purposes and

21  remedial structures of the two statutes also support a consistent

22  interpretation." Id. The panel then concluded, "After reviewing

23  the similarities between Title VII and the ADA, nothing indicates

24  that Congress intended disability-based employment discrimination

25  to be treated any less expansively [than employment

26  discrimination under Title VII]," id., and on that basis, found

27  hostile work environment claims to be cognizable under the ADA.

28  ///

1    The court finds the reasoning of <u>Lanman</u> to be persuasive. In

2  the absence of binding precedent to the contrary, it appears that

3  the ADA will support a hostile work environment claim.

### 3. Is defendant entitled to summary judgment on the issue of exhaustion of administrative remedies?

6    Plaintiff's evidence is sufficient to raise a triable issue

7  of material fact as to whether he was subjected to a hostile work

8  environment.

9    Plaintiff has demonstrated the subjective hostility of the

10  work environment, stating, "I began to experience a great

11  difference in the attitude of my supervisors and actions that my

12  supervisors took that adversely affected me." (Amended Decl.

13  Morgan ¶ 19.)

14    Plaintiff has also adduced uncontroverted evidence as to the

15  objective hostility of his work environment. The following

16  adverse actions occurred shortly after Loerzel's email was

17  forwarded to Durette: the cancelation of plaintiff's annual

18  leave, the agency's failure to provide plaintiff with a partner,

19  the San Francisco program review incident, the notice of proposed

20  five-day suspension, the failure to provide an agency-compliant

21  vehicle, and the denial of the request to attend his aunt's

22  funeral. The proposed suspension was the first discipline

23  plaintiff had been subject to in twenty-plus years of federal

24  employment. It is reasonable to infer that at least two of the

25  actions - the absence of a partner and the lack of a compliant

26  vehicle – could have put plaintiff in harm's way, and were

27  therefore both "sever[e]" and "physically threatening."

28  <u>Dominguez-Curry</u>, 424 F.3d at 1034. These actions, as well as the

1  rapid-fire pattern of incidents (which goes to the "frequency of

2  the discriminatory conduct," id.), could very well have

3  unreasonably interfered with plaintiff's work performance.

4      These incidents were also "sufficiently severe or pervasive

5  to alter the conditions of the victim's employment and create an

6  abusive working environment." Ray, 217 F.3d at 1245. If, as

7  plaintiff avers, it is standard practice that FPS agents work in

8  teams and drive regulation vehicles, then it is potentially

9  hazardous (and thus, a "severe" and "pervasive" alteration of

10 working conditions) to be forced to work alone, in a non-standard

11 vehicle. The court also notes that plaintiff was unaware of

12 Loerzel's email until years later. (Amended Decl. Morgan ¶ 17.)

13 From plaintiff's perspective, then, it may have seemed that

14 everything was going smoothly at work until, one day, management

15 began changing his work conditions and punishing him for no

16 apparent reason. In the court's view, a workplace in which one is

17 subjected to adverse employment actions with little or no

18 explanation qualifies as an "abusive working environment."

19     Finally, plaintiff's first EEOC complaint alleged acts, such

20 as his five-day suspension, which occurred after the 45-day

21 cutoff.[7] "Provided that an act contributing to the claim occurs

22 within the filing period, the entire time period of the hostile

23 environment may be considered by a court for the purposes of

24 determining liability." Morgan, 536 U.S. at 117.

25

26 [7] In his first formal EEOC complaint, plaintiff wrote, "Beginning
   on or about November 3, 2005 and continuing to present, I been
27 subjected to an ongoing hostile work environment." (Mot. Exh. F.,
   ECF No. 41-2.) Plaintiff then listed 15 incidents as examples of
28 the hostile work environment.

1    Accordingly, summary judgment does not appear warranted on

2 the issue of exhaustion of administrative remedies. This decision

3 is consonant with the court's observation, made in addressing

4 defendant's motion to dismiss the Fifth Amended Complaint, that

5 "[p]laintiff is very unlikely . . . to recover separately for

6 discrete acts that occurred outside the statutory window for each

7 EEO complaint . . . but [each act] may be a component of

8 plaintiff's hostile work environment claim, for which he can

9 recover compensatory damages." (Jun. 16, 2011 Order 20:9-17,

10 Morgan I ECF No. 62.) Again, the court does not find here that

11 plaintiff has conclusively demonstrated the existence of a

12 retaliatory hostile work environment; merely, that his evidence

13 is sufficient to create a triable issue of fact as to its

14 existence.

15    **B. Retaliation claims**

16    Plaintiff brings retaliation claims under Title VII, the

17 ADA, and the ADEA. See 42 U.S.C. § 2000e-3(a) (forbidding

18 employee retaliation under Title VII); 42 U.S.C. § 12203 (ADA);

19 29 U.S.C. § 623(d) (ADEA). Specifically, plaintiff claims he was

20 retaliated against for his wife's protected activity, for his

21 perceived support of that activity, and for his own protected

22 activity.

23    Defendant moves for summary judgment on these claims.

24    **1. Standard for retaliation**

25    A plaintiff who lacks direct evidence of retaliation may

26 turn to the burden-shifting framework outlined by the Supreme

27 Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

28

1   (1973). Under this framework, the plaintiff may make out a prima

2   facie case of retaliation by showing that (1) he engaged in a

3   protected activity; (2) his employer subjected him to an adverse

4   employment action; and (3) a causal link exists between the

5   protected activity and the adverse action. Ray, 217 F.3d at 1240

6   (Title VII); see also Pardi v. Kaiser Found. Hosps., 389 F.3d

7   840, 849 (9th Cir. 2004) (ADA); Poland v. Chertoff, 494 F.3d

8   1174, 1179-80 (9th Cir. 2007) (ADEA). Temporal proximity between

9   protected activity and adverse actions is sufficient to support

10  an inference of causation. Ray, 217 F.3d at 1244.

11      In general, "[i]f the employee establishes a prima facie

12  case, the employee will avoid summary judgment unless the

13  employer offers legitimate reasons for the adverse employment

14  actions, whereupon the burden shifts back to the employee to

15  demonstrate a triable issue of fact as to whether such reasons

16  are pretextual." Pardi, 389 F.3d at 849. "If the . . . plaintiff

17  demonstrates a genuine issue of material fact as to whether the

18  reason advanced by the employee was a pretext, then the

19  retaliation case proceeds beyond the summary judgment stage."

20  Coons v. Sec'y of the U.S. Dep't of the Treasury, 383 F.3d 879,

21  887 (9th Cir. 2004).

22      The Ninth Circuit has held that "adverse employment action"

23  means "any adverse treatment that is based on a retaliatory

24  motive and is reasonably likely to deter the charging party or

25  others from engaging in protected activity." Ray, 217 F.3d at

26  1242-43; accord Brooks v. City of San Mateo, 229 F.3d 917, 928

27  (9th Cir. 2000) ("Only non-trivial employment actions that would

28

27

1    deter reasonable employees from complaining about [civil rights]

2    violations will constitute actionable retaliation.").

3        In Ray, 217 F.3d at 1244-45, the Ninth Circuit held that a

4    complainant may seek relief for a series of retaliatory acts that

5    create a hostile work environment. This holding does not appear

6    to be have been displaced by the Supreme Court's subsequent

7    decision in Morgan.

8        Finally, the Supreme Court recently addressed the question

9    of the standard that must be met to establish causation in Title

10   VII retaliation cases, concluding that, "Title VII retaliation

11   claims require proof that the desire to retaliate was the but-for

12   cause of the challenged employment action." Univ. of Texas Sw.

13   Med. Ctr. v. Nassar, __ U.S. __, 133 S.Ct. 2517, 2528 (2013). In

14   at least one subsequent summary decision, the Ninth Circuit

15   applied this standard in upholding summary judgment in the

16   defendant's favor. See Campbell v. Hagel, __ Fed. Appx. __, 2013

17   WL 3971094, 2013 U.S. App. LEXIS 16145 (9th Cir. Aug. 5, 2013).

18   The Ninth Circuit also applies the "but for" standard on summary

19   judgment in ADEA retaliation cases. See, e.g., Scheitlin v.

20   Freescale Semiconductor, Inc., 465 Fed. Appx. 698 (9th Cir.

21   2012). But it applies a "motivating factor" standard in ADA

22   retaliation cases. Head v. Glacier Nw. Inc., 413 F.3d 1053, 1065

23   (9th Cir. 2005).

24              **2. Retaliation under Title VII, the ADA, and the
                   ADEA for spouse's activities**

25

26       In a previous order, which addressed defendant's motion to

27   dismiss plaintiff's Third Amended Complaint, the court instructed

28   as follows: "[P]laintiff may allege a separate claim of third

1    party retaliation for his wife's conduct brought under Title VII,

2    the ADA, and the ADEA together." (Sep. 22, 2010 Order 21:19-21,

3    Morgan I ECF No. 32.) That claim is pled as plaintiff's first

4    cause of action in the operative complaint. (ECF No. 19.)

5       As plaintiff bears the burden of proof at trial, defendant,

6    as the party moving for summary judgment, "need only prove that

7    there is an absence of evidence to support the non-moving party's

8    case." Oracle Corp., 627 F.3d at 387. In her opening brief,

9    defendant argues that plaintiff lacks direct evidence of

10   retaliation or of retaliatory motive. Defendant asserts that the

11   October 2005 email from Loerzel to Ehinger, later forwarded to

12   Durette:

13–19

> is not evidence of retaliation, or of a
> retaliatory motivation on the part of Paul
> Durette. First, the email chain was authored
> by Loerzel and Ehinger, neither of whom is
> alleged to have been involved in any of the
> employment decisions at issue here. At most,
> this email merely establishes that Durette,
> assuming he read the email, was aware that
> Morgan's wife was representing agency
> employees in their EEO claims. This is not
> sufficient to establish a retaliatory motive.
> (Motion 21:17-21.)

20

21   Plaintiff responds, as is his style, by citing to non-binding

22   and/or irrelevant authority, and then embarking on a lengthy

23   recitation of facts. His argument, such as it is, fails to rebut

24   defendant's point.

25      Nevertheless, plaintiff does cite to appropriate authority

26   regarding the McDonnell-Douglas burden-shifting framework, and

27   defendant has responded to this argument in her reply.

28

1    Accordingly, the court will evaluate the matter under this
2    framework.

3         The protected activity asserted by plaintiff is his wife's
4    representation of agency employees in employment disputes. The
5    Supreme Court has recognized that third-party retaliation claims
6    are cognizable under Title VII, a holding that was based in
7    significant part on the text of the statute. Thompson v. N. Am.
8    Stainless, L.P., 562 U.S. __, 131 S.Ct. 863, 868 (2011) ("Title
9    VII's antiretaliation provision is worded broadly. We think there
10   is no textual basis for making an exception to it for third-party
11   reprisals, and a preference for clear rules cannot justify
12   departing from statutory text.") The anti-retaliation provisions
13   of the ADA and ADEA are similarly worded to that of Title VII.
14   See 42 U.S.C. 2000e-3(a) (Title VII); 42 U.S.C. § 12203 (ADA); 29
15   U.S.C. § 623(d) (ADEA). Accordingly, while neither Supreme Court
16   nor the Ninth Circuit has explicitly addressed the issue, it
17   would appear that the Court's reasoning in Thompson applies
18   equally to the ADA and the ADEA. Third-party retaliation claims
19   therefore appear equally cognizable under those statutes.

20        Plaintiff has shown that he was subject to acts, such as
21   non-promotion and being given an easily-identifiable vehicle in a
22   law enforcement position, which are undeniably "non-trivial."
23   Brooks, 229 F.3d at 928. These acts, and other adverse employment
24   actions, such as suspension without pay, denial of leave, non-
25   promotion, etc., would be "reasonably likely to deter the
26   charging party or others from engaging in protected activity."
27   Ray, 217 F.3d at 1242-43. And, as discussed earlier, plaintiff
28

1   has also raised a triable issue of fact as to whether he was

2   subjected to a hostile work environment.

3       Which brings us to causation. The crux of plaintiff's case

4   lies in the email from Loerzel to Ehinger, which was then

5   forwarded to Durette on October 28, 2005. Before that email was

6   forwarded, plaintiff's career at the agency was going smoothly;

7   he had never been disciplined, and in the previous two years, he

8   had been placed in positions of increasing responsibility. After

9   the email, everything went downhill; over the next four years, he

10  experienced a number of negative incidents, and was eventually

11  terminated. "Essential to a causal link is evidence that the

12  employer was aware that the plaintiff had engaged in the

13  protected activity." Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796

14  (9th Cir. 1982). The assertion is that retaliation commenced when

15  higher-ups became aware that Becker, plaintiff's wife, was

16  representing employees against the agency, possibly with

17  plaintiff's assistance.

18      The first alleged incident of retaliation – the cancelation

19  of plaintiff's annual leave – occurred on November 4, 2005, one

20  week after the email was forwarded to Durette.[8] This is well

21  within the interval from which the Ninth Circuit has inferred

22  causation. See, e.g., Miller v. Fairchild Indus., 797 F.2d 727,

23  _____

24  [8] Even if the court had not found a triable issue of material fact
    as to the existence of a hostile work environment claim, these
25  incidents could still be considered as evidence of retaliation
    despite plaintiff's failure to timely exhaust administrative
26  remedies as to them. "[D]iscrete discriminatory acts are not
    actionable if time barred, even when they are related to acts
27  alleged in timely filed charges. [. . .] [But] the statute [does
    not] bar an employee from using the prior acts as background
28  evidence in support of a timely claim." Morgan, 536 U.S. at 113.

31

731-32 (9th Cir. 1986) (finding that causation could be inferred where plaintiffs were laid off less than two months after negotiating EEOC settlements); <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987) (finding that causation could be inferred where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended).

Defendant argues that "[t]he nonselections and other acts of which [plaintiff] complains occurred years after Becker began representing employees of the agency . . . ." (Reply 6-7, ECF No. 48.) This is beside the point. Plaintiff has made out a case for retaliation based on Durette's knowledge of his wife's protected activity, not on the activity itself.

As plaintiff has established a prima facie case, the burden shifts to the defendant to offer legitimate reasons for the adverse employment actions alleged. Defendant largely fails to meet this burden. While she has provided legitimate reasons for some of the adverse actions - such as plaintiff's non-selection to the position of Chief, Threat Management Bureau in early 2006 based on low interview scores and his "odd, unprofessional, and inappropriate" reading of a Kipling poem during the interview, many others - such as the cancelation of plaintiff's leave, the non-issuance of a standard vehicle, and the denial of his request to attend his aunt's funeral - remain unaccounted for. Moreover, as discussed above, plaintiff has raised a triable issue of material fact as to whether he was subjected to a hostile work environment. Defendant has not offered legitimate reasons for a number of the incidents alleged to have comprised this

environment. As defendant fails to meet her burden, she must be denied summary judgment on this claim.

### 3. Retaliation under Title VII, the ADA, and the ADEA for perceived assistance to spouse

In a previous order, which addressed defendant's motion to dismiss plaintiff's Third Amended Complaint, the court held that: "[P]laintiff may allege a claim of direct retaliation resulting from [the] accusation that he aided and abetted his wife's representation of his co-workers in suits brought under Title VII, the ADA, and the ADEA. This single cause of action may be pled under the three statutes together." (Sep. 22, 2010 Order at 21, Morgan I ECF No. 32.) That claim is pled as plaintiff's second cause of action in the operative complaint. (ECF No. 19.)

Loerzel's October 28, 2005 email both referred to Becker's protected activities, and insinuated that plaintiff was aiding her ("Anyway, without getting into the weeds and suggesting improprieties, she seems to get background information on these cases that attorneys' [*sic*] usually don't have. I think there's a potential conflict of interest there.") Accordingly, the analysis in the preceding section applies equally to plaintiff's claim that he was retaliated against for perceived assistance to his wife.

### 4. Retaliation under Title VII and the ADEA for opposing discrimination

Plaintiff's third cause of action alleges retaliation for "being perceived as assisting Michael Conrad in his discrimination complaint . . ., representation of Douglas Neibauer and Nathan Bailey, beginning in April of 2007, because

33

of race, age and reprisal . . . and for the initiation of complaints of discrimination for himself on the basis of reprisal and age . . . ." (Complaint ¶ 129, ECF No. 19.)

Having reviewed the motion papers, it does not appear that defendant has raised any grounds for summary judgment on these claims beyond those discussed above. Accordingly, these claims will be left undisturbed. Nevertheless, the court's prior orders regarding this cause of action remain in full force:

- Addressing defendant's motion to dismiss plaintiff's Third Amended Complaint, the court previously held that plaintiff could only allege retaliation for his assistance to Neibauer and Bailey based on acts which occurred after that assistance commenced. (Sep. 22, 2010 Order 15:12-18, Morgan I ECF No. 32.)

- Addressing defendant's motion to dismiss plaintiff's Fourth Amended Complaint, the court previously held that plaintiff could only allege that he was retaliated against for filing an EEO complaint in March 2006 based on acts which occurred after he filed that complaint. (Feb. 9, 2011 Order 4:2-4, Morgan I ECF No. 55.)

### C. ADEA claim

The ADEA bars employers from discriminating on the basis of age against individuals who are at least 40 years old. 29 U.S.C. §§ 623(a)(1), 631(a). The ADEA applies to federal employees. 29 U.S.C. § 633a(a).

///

///

34

### 1. Direct evidence of discrimination

Defendant argues that plaintiff has insufficient direct evidence of age discrimination to sustain a claim under the ADEA. Plaintiff's evidence is as follows:

- Meyerhoff averred, "I heard the use of the term 'youthful & vigorous' by HQ management on many an occasion, to include [sic] Deputy Director Paul Durette, regarding the hiring practices under DHS, ICE, FPS while in Washington, D.C. Durette also mentioned the term at a Regional Director's conference I attended in Philadelphia in 2004." (Decl. Meyerhoff ¶ 14, ECF No. 42-2.)

- An email from a "director," Wendell Shingler, sent nationally that contained the comment "young and vigorous, youthful and vigorous," as described in plaintiff's deposition. (Depo. Morgan 116:11-25, ECF No. 41-1.)

These remarks are insufficient to present a triable issue as to whether plaintiff was a victim of direct age discrimination. In the context of employment discrimination suits, "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decision process itself" are termed "stray remarks." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989). Under federal antidiscrimination law, such remarks are largely deemed irrelevant, and their assertion is insufficient to withstand summary judgment. See, e.g., Merrick v. Farmers Ins. Grp., 892 F.2d 1434 (9th Cir. 1990) (stray remarks insufficient to "show[] that the decision not to promote [plaintiff] was based on age."). While Durette appointed individuals who were involved in alleged

1  adverse employment actions, plaintiff does not adduce any direct

2  evidence that the adverse actions were connected to his

3  (plaintiff's) age. He similarly fails to adduce any direct

4  evidence demonstrating a connection between Shingler and/or his

5  email, and any adverse employment actions.

6      Accordingly, plaintiff has failed to present direct evidence

7  that he suffered age discrimination in employment.

8                    **2. Disparate treatment**

9                        **a. Standard**

10     Traditionally, a plaintiff who lacked direct evidence of

11 ADEA discrimination could nevertheless rely on the burden-

12 shifting McDonnell-Douglas framework to survive summary judgment.

13 See, e.g., Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917

14 (9th Cir. 1996).

15      The viability of this approach was thrown into question by

16 the Supreme Court's recent holding that, to prevail at trial on

17 an age discrimination claim, a plaintiff must prove that age was

18 the "but for" cause of any adverse employment action. Gross v.

19 FBL Fin. Servs., 557 U.S. 167 (2009). The Ninth Circuit

20 nonetheless distinguished Gross and has continued to hold that

21 plaintiffs may continue to rely on the McDonnell-Douglas

22 framework at summary judgment:

23          Thus, to survive summary judgment on his
            claim for a violation of the ADEA under the
24          disparate treatment theory of liability,
            [plaintiff] must first establish a prima
25          facie case of age discrimination. If he is
            successful, the burden of production shifts
26          to the [defendant] to articulate a legitimate
            non-discriminatory reason for its adverse
27          employment action. It is then [plaintiff's]

28

                              36

1
2
3
4

        task to demonstrate that there is a material
        genuine issue of fact as to whether the
        employer's purported reason is pretext for
        age discrimination. At trial, he must carry
        the burden to prove that age was the "but-
        for" cause of his non-selection.

5   Shelley v. Geren, 666 F.3d 599, 608 (9th Cir. 2012) (internal
6   citations omitted).

7       To establish a prima facie case of failure-to-promote under
8   the ADEA, the plaintiff must demonstrate "that he or she was
9   (1) at least forty years old, (2) qualified for the position for
10  which an application was submitted, (3) denied the position, and
11  (4) the promotion was given to a substantially younger person."
12  Shelley, 666 F.3d at 608.

13      To establish a prima facie case of wrongful termination on
14  the basis of age, plaintiff must demonstrate that he "was (1) at
15  least forty years old, (2) performing his job satisfactorily, (3)
16  discharged, and (4) either replaced by substantially younger
17  employees with equal or inferior qualifications or discharged
18  under circumstances otherwise 'giving rise to an inference of age
19  discrimination.'" Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d
20  1201, 1207 (9th Cir. 2008) (quoting Coleman v. Quaker Oats Co.,
21  232 F.3d 1271, 1281 (9th Cir. 2000)).[9]

22      A "prima facie case requires evidence adequate to create an
23  inference that an employment decision was based on a[n] [illegal]
24  discriminatory criterion." O'Connor v. Consol. Coin Caterers

25
26
27
28

---

[9] Both plaintiff and defendant incorrectly characterize the Diaz
test as requiring plaintiff to show that he "(3) was subjected to
an adverse employment action, and (4) a substantially younger
employee with equal or inferior qualifications was treated more
favorably." (Motion 17-18; Opposition 26.) Diaz is a wrongful
termination case. The proper test is set forth above.

1  Corp., 517 U.S. 308, 312 (1996) (internal quotation marks

2  omitted) (alterations in original).

3              **b. Non-promotion due to age discrimination**

4      Plaintiff claims he suffered disparate treatment on the

5  basis of age when John Hartman was selected over him for the

6  position of Supervisory Criminal Investigator.

7      Plaintiff adequately exhausted administrative remedies as to

8  this claim, as it was included in his July 26, 2006 formal EEO

9  complaint

10     Plaintiff, who was born in 1947, was at least forty years

11 old at the time of the relevant events.

12     Plaintiff has shown that he was "qualified for the position

13 for which an application was submitted[.]" Shelley, 666 F.3d at

14 608. He had served as Acting Supervisory Criminal Investigator

15 from December 15, 2003 to May 25, 2005. Plaintiff has submitted

16 the declaration of a supervisor averring that, in that role (and

17 in other acting positions of even greater responsibility), he

18 "worked diligently," "became knowledgeable in all areas of

19 management," and "assume[d] extra duties." (Decl. Oase ¶ 13, ECF

20 No. 42-4.) It is reasonable to infer that, having competently

21 fulfilled the duties of the "acting" position, plaintiff was

22 qualified for the permanent position.

23     It is undisputed that Hartman, some twenty years younger

24 than plaintiff, was given the permanent position. (Decl. Oase ¶

25 29, ECF No. 42-4.) Plaintiff has therefore shown that he was "(3)

26 denied the position, and (4) the promotion was given to a

27 substantially younger person." Shelley, 666 F.3d at 608.

28
                              38

As plaintiff has made out a prima facie case, the burden now shifts to defendant to "provide a non-discriminatory explanation for its hiring decisions." Id. at 609. Defendant has done so, explaining that, "The [three-member] interview panel . . . scored all of the candidates, with rankings from a high of 40 to a low of 24. The individual selected, John Hartman, was ranked 33, considerably higher than Morgan's ranking of 24. This was the reason [the acting Regional Director] selected Hartman over Morgan."[10] (PR-DSUF ¶ 88.)

The burden again shifts to plaintiff to raise a genuine factual question as to whether defendant's explanation is pretextual. He "can prove pretext '(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.'" Id. at 609 (quoting Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1124 (9th Cir. 2000)).

The evidence adduced by plaintiff is sufficient to support a finding of pretext. To wit:

- As Acting Supervisory Criminal Investigator, plaintiff had been Hartman's supervisor from December 15, 2003 to May 25, 2005. As Acting Chief, Threat Management Bureau, he had also been Hartman's supervisor from March 21, 2005 to November 7, 2005. (PSDF ¶ 9.F.;

---

[10] According to an affidavit filed by defendant, an external candidate scored 40; his external status brought various complications (such as lack of region knowledge and relocation expenses) that made him undesirable.

1    Amended Decl. Morgan ¶ 36, ECF No. 47-1; Decl. Oase

2    ¶ 29.) In other words, plaintiff had been Hartman's

3    supervisor as recently as three-and-a-half months

4    before Hartman was promoted over him. It is reasonable

5    to infer from this fact that plaintiff was the more

6    experienced candidate of the two.

7    • Hartman was color blind. Morgan's previous supervisor

8    claims that Hartman never received a waiver for this

9    condition. (Decl. Oase ¶ 30.)

10   In the absence of any rebuttal evidence, one could find that

11   these facts are inconsistent with a determination that Hartman

12   was the superior candidate for the position. Plaintiff has

13   therefore indirectly shown pretext, and can survive summary

14   judgment on his "failure to promote" age discrimination claim.

### c. Wrongful termination due to age discrimination

17   Plaintiff claims he suffered disparate treatment on the

18   basis of age in that Mario Canton, a younger employee, was

19   treated more favorably than he.[11] As discussed above, the

20   formulation advanced in _Diaz_, 521 F.3d at 1207 (the case cited by

21   both parties) addresses wrongful termination. Plaintiff cannot

22   meet the standard. Even if he could make out a prima facie case

23   of wrongful termination, he has failed to demonstrate any pretext

---

25   [11] Plaintiff's opposition devotes many pages to facts regarding
     Canton, but (other than the citation to _Diaz_) does not take the
26   necessary step of connecting the facts adduced to the elements of
     any cause of action or test under the ADEA. Accordingly, the
27   court has disregarded virtually everything in plaintiff's
     opposition regarding Canton as irrelevant. Legal argument is the
28   parties' job, not the court's.

1  in his termination. It is undisputed that plaintiff, in violation

2  of the standards governing OPR investigations, revealed

3  information about the investigation to ICE Special Agent Luz

4  Dunn. The Notice of Proposed Removal issued to plaintiff

5  specifically identified this violation as a reason for

6  plaintiff's termination, and it was upheld by both the arbitrator

7  and the MSPB. Plaintiff has failed to adduce evidence

8  demonstrating that this rationale was pretextual.

9      As plaintiff does not make out a prima facie case of

10  wrongful termination on the basis of age, defendant is entitled

11  to summary judgment on this claim.

12                    **3. ADEA damages**

13      Defendant also seeks summary judgment as to various forms of

14  damages sought by plaintiff under the ADEA.

15      Defendant contends that the ADEA "does not permit separate

16  recovery of compensatory damages for pain and suffering or

17  emotional distress." In support, she cites <u>Comm'r. of Internal</u>

18  <u>Revenue v. Schleier</u>, 515 U.S. 323, 326 (1995) (recognizing that

19  "the Courts of Appeals have unanimously held, and respondent does

20  not contest, that the ADEA does not permit a separate recovery of

21  compensatory damages for pain and suffering or emotional

22  distress[.]") and <u>Ahlmeyer v. Nevada Sys. of Higher Educ.</u>, 555

23  F.3d 1051, 1059 (9th Cir. 2009) ("Compensatory damages for pain

24  and suffering and punitive damages are not available under the

25  ADEA."). Plaintiff concedes this point. (Opposition 27 n. 16.)

26      Defendant also contends that liquidated damages for

27  willfulness under the ADEA are unavailable to federal employees,

28

                           41

1   citing Smith v. Office of Pers. Mgmt., 778 F.2d 258, 263 (5th

2   Cir. 1985) (explaining that "[t]here is no mention of liquidated

3   damages in [29 U.S.C § 633a], the self-contained section of the

4   ADEA applicable to federal employees."). The Ninth Circuit has

5   not ruled on this issue, but several district courts in

6   California have so held. See, e.g., Tietz v. Bowen, 695 F. Supp.

7   441, 446 n. 5 (N.D. Cal. 1987) (Orrick, J.). Plaintiff concedes

8   this point, so the court does not find it necessary to make an

9   independent determination. (Opposition 27 n. 16.)

10      Accordingly, summary judgment will be entered in defendant's

11  favor on both of these damages claims.

12              **C. Review of MSPB decision**

13      Defendant has moved for summary judgment on plaintiff's

14  fifth cause of action, which seeks judicial review of the MSPB

15  Decision, arguing for the court to affirm the MSPB's findings.

16      Defendant's motion is inconsistent with the court's previous

17  order consolidating Morgan I and Morgan II:

18          Plaintiff also argues that the court's review
19          of the [Merit Systems Protection Board]
            Decision in Morgan II would prejudice the
20          jury as to his remaining claims. He appears
            concerned that the court may uphold the MSPB
21          Decision, e.g., on a motion for summary
            judgment, and that this decision would then
22          be communicated to the jury at trial. This
            concern can be properly addressed by
23          bifurcating plaintiff's cause of action for
            review of the MSPB Decision, and postponing
24          consideration of this cause of action until
            after the remaining issues in this case are
25          decided. (Oct. 4, 2012 Order 6:17-7:3, ECF
26          No. 18.

27  The court then ordered: "Plaintiff's cause of action for judicial

28

review of the Merit Systems Protection Board order dated April 13, 2012 shall be tried to the court separately following trial on all other causes of action herein. The parties may not refer to the proceedings that led to this order, or the order itself, in any proceedings before a jury herein." (Id. 8:24-9:5.)

Defendant claims that she was simply trying to meet the law & motion deadline in the court's scheduling order. Plaintiff contends that, in light of the court's prior order, the motion on this bifurcated issue should be denied.

The court will follow its prior order. Defendant may renew her motion following trial on the remaining causes of action herein.

**IV.  CONCLUSION**

In light of the foregoing, the court hereby orders as follows:

[1] Summary judgment is GRANTED to defendant on plaintiff's claims under the ADEA for (i) wrongful termination, (ii) compensatory damages for pain, suffering, and/or emotional distress, and (iii) liquidated damages.

[2] In all other respects, defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED:  December 19, 2013.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

43